The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. Please be seated. Madam Clerk, would you call our docket for this morning, please? Yes, Your Honor. The following cases are scheduled for argument this morning, Tuesday, September 16, 2025. Case No. 24-2572 from the Eastern District of Missouri, Linda Scobee et al. v. USAA Casualty Insurance Company. Case No. 2, Case No. 24-2830 from the Western District of Missouri, Marcia Sorin et al. v. Folger Coffee Company et al. Case No. 3, Case No. 24-2295 from the Western District of Missouri, Georgette Sherman v. Douglas A. Collins, Secretary, United States Department of Veteran Affairs. The fourth case for argument, Case No. 24-2969 from Western Missouri, United States v. Benjamin Stripland. And the last case for oral argument, Case No. 24-3159 from the Northern District of Iowa, Michelle Siebert v. Mercy Health Services, Iowa Corporation. First case for argument, Linda Scobee et al. v. USAA. Ms. Rogers, if you're prepared, please proceed. May it please the Court, my name is Lindsay Rogers, and along with Edward Cook, we have the privilege of representing Michael and Linda Scobee, the appellants in this matter, since the day this accident occurred on April 4, 2015. This is not a closed call. This is a case about a manufactured dispute and a fabricated defense. If the district court's ruling is allowed to stand, it will have a ripple effect that will essentially eviscerate the bad faith laws in every jurisdiction of this country. All an insurer will have to do is have a conversation with its insured, and if that conversation ends with, I didn't do it, I didn't have anything to do with it, it can ignore all other evidence, say it disputes liability, and deny the claim. Excuse me, counsel, could you help me? I believe the insurer in this case hired an investigator, is that right, to make a report? Is that correct? The insured in this case, William Norris, hired an expert, USAA hired an expert, three years after this accident occurred, at the end of 2018. And what did that expert report? The expert said that the account of William Norris, which only came about after litigation commenced, that he hit a guardrail, that that is what made the damage on the driver's side of his car, that's how it occurred. Okay, right. So that's another question I have. If the damage was on the driver's side of the car, how do you account for the, I don't understand how that would fit with the wreck, which indicated that the deceased had gone off on the right side, isn't that right, of the road? So the, Kevin Johnson, who was the SCOBY's expert, detailed this pretty clearly. It happened, Michael SCOBY was driving a motorcycle that he had just purchased. I'm sorry, was this the expert in the underlying, in the tort case? Yes, sir. Yes, thank you. And he was driving his brand new motorcycle, William Norris was in a brand new rental car behind him. Michael SCOBY testified that he didn't feel comfortable, because William Norris was driving so close. He attempted to move lanes. As he was changing lanes, William Norris gunned his car, essentially, clipped Michael SCOBY, had the crack created. I see, yes. You say the markings match the motorcycle. Yes, your honor. I see, yes. Counsel, what you're reciting is your version of the facts, correct? No, your honor, that's what happened. The component parts of the motorcycle matched the measurements of the side swipe damage. The investigating officer… Well, what I'm saying is there was no eyewitness to the actual contact between the motorcycle and the rented vehicle. William Norris and Michael SCOBY were the two witnesses. When Michael SCOBY awoke from a coma, he told his treating physicians, I was in an accident with another vehicle. The component parts, the measurements match up. The investigating officer said it was fresh damage. I'm not saying that there was no accident. I'm saying that to witness the description that you gave, there was no one who saw that other than the two people who were occupying the one on the motorcycle and one in the vehicle. Yes, your honor. There were two eyewitnesses to the actual accident, Michael SCOBY and William Norris. So, we also have Linda SCOBY, who was riding behind her husband in the car since they had just purchased the motorcycle. She recounted to the police officer, and it's in the police report, that William Norris was driving aggressively and erratically. So much so that he cut in front of her so closely she had to slam on her brakes. Didn't the police officer that initially investigated attribute operator conduct on the motorcycle to the accident? I'm glad you brought that up because the district court erroneously viewed this fact in a light most favorable to USA and actually just got it flat out wrong. In the deposition of the investigating officer, he noted that his portion of the police report that indicated that Michael SCOBY lost control and that's why he left the roadway. That's why he left the roadway. He was not opining about what made him lose control. That part of the police report was very specific and he testified as much and cleared that up. He also testified that it was his opinion that the side swipe damage, which William Norris at the scene in a recorded statement told the police officer that all the damage from this brand new rental car happened at this accident. It was the police officer's opinion that it was fresh damage, it was not old damage, which the guardrail fabricated defense said that William Norris hit a guardrail a few days before this accident. And again, that came about for the first time in an interrogatory response. Prior to that, there was no mention of a guardrail in the claim file. There was no mention of the guardrail to the investigating officer when he asked William Norris how did that damage get there. That side swipe damage was clearly the focus of this investigation and there was significant concern about how it got there. When did this information come to light in the tort case? All of this information that I just talked about was available at the time it was submitted as part of the police report. So the erratic driving, the photographs that the police officer took, and the measurements of those damages, obviously his deposition happened during the litigation. That's what I mean, the underline, the tort case. Yes, sir. Okay, thank you. Yes, sir. All of this happened in the underlying tort case. So is there some temporal difficulty here about when it was that the insurance company knew what? And whether there's some kind of ongoing obligation to sort of upgrade one's evaluation of the risk of the liability? Is that an issue here? Yes, Your Honor, there is an ongoing duty. The Kentucky Unfair Claims Settlement Practice Act says that there is an ongoing duty. First, you're supposed to promptly investigate. But if new information does come to light, there is case law out there that changing your determination is permissible. In fact, it is encouraged. You should. You should value a claim promptly and based on the available information. At the time of the first denial, when they responded to the SCOBY demand, what USA had was the police report, photographs, and the demand outlining our theory of liability, as well as lost wage claims and $800,000 in medical bills. They also had the medical record where Michael SCOBY awoke talking about how he was in an accident with another vehicle. They also asked you if you had any further information. Isn't that right? There was no response. They asked, they couldn't understand. The claim adjuster in her deposition testified that she believed, on her own, armed with a high school education and no training, that the accident couldn't have happened the way that we described. Although all of the physical evidence lined up, including USAA's expert. He agreed the component parts matched the measurements and the damage to the Norris vehicle. But she decided it couldn't have happened that way. At what time were you talking about? At the time of the denial, in September of 2015. Okay. She did not go to the inspection of the Norris vehicle, despite the fact that it was available prior to the denial. And USA claims that they did not deny this claim, but Catherine Luker, in transmitting this file to outside counsel, clearly says this is a claim where we deny liability. And in her response to us at the time of the demand in October 2015, she says we see no liability on the part of our insurer. That was based solely on her conversation, unrecorded, with Mr. Norris. Who, by the way, turned out to be a liar on multiple occasions. Most notably, about his heroin use the morning of the accident. Which was concealed from us, deliberately, for the entirety of this case. It was not made known to us until January of last year. When was that information made known to the insurer? In 2017. There is an entry in the litigation file of USAA, a week after Mr. Norris' deposition, where it says that he admitted to using heroin 13 hours before the accident. But because PA, plaintiff's attorney, only asked whether he used drugs 12 hours before the accident, that that wasn't going to be turned over. USA is claiming that was privileged. The problem with that is, in his deposition, he was asked, what did you do? You woke up at 4.30 a.m., what did you do? I got ready and I went to work. He also mentioned he took his medication, Suboxone, for his addiction. He conveniently never mentioned he used heroin that morning. Got in his car, drove 100 miles to work. Was there anything in the record to indicate he was impaired at the time of the accident? Yes, Your Honor. There is Linda Scobie and her recorded statement to the police officer, which was available to USAA, but was never obtained by USAA at the time of its denial in September 2015, but became known to them during litigation. She claimed that William Norris, whom she does not know from Adam, had no idea what his background was, that he was acting sketchy, and that he acted like he was strung out. Unfortunately, she knew what that looked like because she has a child with addiction issues, and she's seen it before. She also recounted his erratic and aggressive driving right before the accident. So this isn't in a vacuum. This drug information was important. And defense counsel knew about it and never corrected the deposition testimony and never answered the interrogatory with the information. Not only that, right before trial, right before Mr. Norris died and trial was then moved, there was a motion eliminating file to prevent any questions about his drug use, that it played, quote, no role in the accident, when they knew that it played a role in this accident. Under Kentucky law, it's a pretty high bar they seem to set for obtaining liability against the insurer on this type of a claim, which is a tort claim and not a contract claim. Describe what, under Kentucky law, these facts show a violation of Kentucky law. Yes, Your Honor. So first and foremost, the Kentucky Unfair Claims Settlement Practice Act requires a prompt and fair investigation based on all available information. Available information is a very key word because if you turn your blind eye and you don't seek the information that's available, then that is not compliant with the statute. The second thing is you must effectuate a prompt and fair settlement, especially when liability becomes reasonably clear. I want to make it a point that the USAA claim file assigned 70% of fault to its insurer. It never made an offer. There was no indication as to who wrote that note or when, was there? Your Honor. It's just a sort of a, I'm sorry, just a kind of a, I don't mean to denigrate it at all, but it was a kind of a straw in the wind. There's just sort of, it's out there like it's just sort of floating there with no indication of who wrote it or when or to whom it was directed. Isn't that correct? That's correct, Your Honor. I would submit, though, that that's irrelevant because at some point someone at USAA knew that their insurer was 70% at fault. I thought so anyway. Pardon? I thought so. Yes, and the litigation file notes that he has significant credibility issues. And also USAA claims that the SCOBIs rejected their offers. And several points in the brief they used this word to give the illusion that one was ever made. It was never made. But the fact that this argument is made is incredible because what it's saying is USAA agreed an offer should be made, but they never made one. Not only that, more egregious is that they never paid. Did she ever make a claim or an assertion for the policy limits, which was pretty clear to everybody what the contract called for in terms of payment? Yes, Your Honor. The demand was submitted on September 18, 2015 with all, and the 30B6 deposition agreed it was a comprehensive demand. It had $800,000 approximately, a little less than $800,000 in medical bills and records, photographs, police reports, and lost wage information, and our theory of liability. Everything was there. They responded in three weeks with a denial. So more importantly, they never paid a dime. Even after the $7 million judgment was entered after a little over an hour of deliberation by a St. Louis County jury, and that $100,000 was no longer in dispute, and our expert testimony that's still intact. They offered it to you, didn't they, in full satisfaction of the judgment? A satisfaction of judgment, Your Honor, which I would submit to you. Why didn't you accept that? Your Honor, because the judgment was $7 million. I know, but how could they be on the hook for that? Well, my argument today is that at that point there's no question that at a minimum the $100,000 policy is no longer in dispute.  It's owed. I understand. And it was never paid. That's why he's asking why didn't you take it. They never paid it. They offered it to you. They file a satisfaction of judgment. We're not going to take $100,000 as satisfaction of a $7 million judgment. Well, who else are you going to? This is not meant to be rhetorical. I'm asking a procedural question here that I may not understand. Who else are you going to recover that from? Who else is on the hook for it? Well, they made a motion to the trial court to deposit the money into the court registry, and the court said you can do that, and they never did. They did not pay until July of last year, almost five years after that $7 million judgment. I submit to you that that in and of itself is bad faith. That failure to pay, it was no longer in dispute at that point, that at a minimum, that $100,000 policy was due. What Kentucky case stands for that? Pardon? What Kentucky case stands for that proposition? Well, it's in the statute. You have to effectuate a prompt and fair settlement when liability becomes reasonably clear. But no, what I'm asking is there a Kentucky case that says not paying it into the court registry or sending you a check constitutes a breach of that statutory obligation? Well, if it's owed, then it should be paid. There is case law on delay of payment is not enough under the statute, and this is delay of payment by two years or three years. We're talking about five years. We're talking about a judgment. We're not talking about a settlement negotiation. Again, you're supposed to pay what you owe. That's what USAID keeps saying. The judgment was against their insured. It was not a judgment against the insurance company. That didn't come until after the tort suit. Right, but the policy is in play, Your Honor. The policy has come due at that point, at a minimum. We obviously got a $7 million. We got an excess judgment. But the fact that at that point liability is reasonably clear, a jury in a little over an hour said, William Norris caused this accident. They now owe the policy, and they have to pay. That is the Kentucky Unfair Claims Settlement Practice Act black letter. The case law on that probably doesn't exist, other than the delay in payment is not sufficient to rise the level of bad faith. But we have a myriad of other issues going on here that do rise to the level of bad faith. And I would submit that five years after a judgment would be more than reasonable for this court to deem that to be a delay in payment. The delay in payment is important when it is used to gain an advantage, which is exactly what happened here. After the verdict, after the judgment, when they still didn't pay, they filed a deck action to delay payment even longer, to say that they needed to understand their obligations under Missouri law. Well, your obligations were to pay at that point. You have a $7 million judgment and a $100,000 policy that's no longer in dispute. Further, the deck action, if you look at the judicial determinations, they are very broad. They are seeking to cut the Scobies off from any bad faith recovery in any jurisdiction, including Kentucky, which has this unique third party claim available to people like the Scobies. Ms. Rogers, you're well within your rebuttal time. You can continue if you like or reserve. I'll reserve, Your Honor, unless the court has any further questions. Thank you. Mr. Nyman. Thank you, Judge Smith, and may it please the court. My name is John Nyman. I'm here for USAA. The vast majority of Kentucky decisions that have addressed the cause of action that is at issue in front of the court today have directed the entry of judgment as a matter of law for the defendant. That's because Kentucky law allows bad faith claims to go to juries only in the most limited of circumstances. The district court rightly held that this case did not present those circumstances. I obviously disagree with my colleague, Ms. Rogers, about much of her argument today, but I'd like to start my argument, if I can, on a point of potential agreement between the parties. The Scobies have emphasized and emphasized to the district court that time periods matter a great deal in this case. They are right about that. As the district court noted at page 14 of its opinion, although the Scobies have sometimes painted with a very broad brush temporarily, as they have done today during their oral argument, the critical time period in this case for the purposes of assessing whether there was a bad faith failure to settle is actually very narrow. Kentucky law doesn't require insurers to settle claims at amounts above the policy limits, so the critical period here was the very narrow window that Ms. Rogers mentioned in the fall of 2015 when the Scobies were willing to settle for Mr. Norris's $100,000 policy limit. That was when the Scobies sent the letter Ms. Rogers mentioned in September 2015, giving USAA only 30 days to accept. After that point in time, after the 30-day deadline exploded in October 2015, it's undisputed that the Scobies were unwilling to settle for limits ever again. Mr. Scobie testified at his deposition at page 910 of the appendix that he would not ever have accepted $100,000 to settle his case. In 2017, after some of the events to which Ms. Rogers adverted during her argument, Mr. Norris's lawyer approached the Scobies about their willingness to settle for policy limits at that time. He was told that they were not interested in policy limits and were looking to obtain the largest jury verdict possible. Well, as it played out, that position had some support, didn't it? They ended up with a $7 million jury verdict. They certainly ended up with a $7 million... For me, this is a question, and I've listened to the discussion so far this morning, but for me, something I'd really like clarification. I'm not sure I understand why, at least after the jury had returned this $7 million verdict, why the USAA at that point did not have an obligation to simply tender its policy limits and walk away from the case instead of conditioning the tender with the settlement of the judgment. Well, the tender letter on page 1257 of the appendix stated that the USAA was offering the $100,000 policy limits in full satisfaction of the judgment. There was no response from the Scobies at that point in time saying... But why was that? How can that be even considered a permissible position? Why would the successful plaintiff in that case be inclined to accept that kind of offer? Well, ultimately, the proof was in the pudding, Judge Shepard. The Missouri District Court, in a collateral proceeding to this case, a separate proceeding, found that the USAA was, in fact, only on the hook for the $100,000 judgment. In fact, it defended Ad Litem, whom the Scobies agreed to be substituted in favor of Mr. Norris, who had passed away before this case was tried and was unable to testify in his defense at this trial. That doesn't really... I don't really have an issue with that. That sounds like a reasonable decision. But we get back to the question of why USAA simply didn't pay it after this extremely large jury verdict. Well, USAA offered the $100,000 in that letter in full satisfaction of the judgment. It was not as if the Scobies' attorneys turned around and said, wait a minute, we're not accepting that condition, but here are the instructions by which you should... To Judge Shepard's question, couldn't you just put it into the court's coffers, and if you want it, you can go to the court and get it. We're done. We've completed our obligation in this matter. Well, I mean, in a typical case, I'd suggest that the plaintiffs would simply either provide instructions about where the payment was to go or communicate back to the defendant, we're not agreeing to that stipulation. Here's what we will agree to. It's highly unusual, I think, for the defendant to be forced by the plaintiff to pay... But you didn't have to require a stipulation. You could have just paid the money to the court and said, we're done. Right, but at that point in time, it was unclear to us whether we could even pay the money into the court registry. Ultimately, we obtained a declaratory judgment from Judge Ross in this case, saying that that was an appropriate way to handle the issue, but at the time, it was unclear. So the defendant ad litem... Well, I mean, in good faith, how could you take the position that you could not do that? What would be a reason that you couldn't do that? Well, I mean, they had refused to take our offer thus far. We didn't know whether the court registry was the appropriate place to place the funds. I mean, usually, a court registry is a place where you place funds for the purposes of an interpleader or the like. It's highly unusual, I'd suggest, that the court registry would be the place where the defendant would pay the judgment to a successful plaintiff after a jury verdict. So USIA's position was, given the lack of a response from the Scobies, it simply did not know what to do. You could have cut a check to the Scobies. Could that have been a possibility? We had the check ready to go to the Scobies, and we sent a letter to the Scobies saying, we're ready to... That was on a condition, though. It was on a condition that there was full satisfaction of the judgment, right? Which was an appropriate condition. Well, why? That's the question that I had. You owe the money, don't you? Yeah, at that point in time, the underlying judgment debtor owes the money. So that's the defendant ad litem. The defendant ad litem has a nominally $7 million... Your policy clearly covered it, did it not? At that point in time, we have a judgment against the insured. That's one that USIA's policy would cover, and that's why USIA made the offer. But ultimately, I mean, the question here is whether this amounts to bad faith, whether this is evidence from which a jury could find bad faith under the exacting standard that Kentucky law provides. And it doesn't only require that liability be undisputed. It also requires that the insurer act in an outrageous way or a recklessly indifferent way. And everything that USIA did... Keep in mind, I mean, the principal claim here from the SCOBIs concerns their initial 30-day short fuse demand, failure to pay a settlement at that point in time. All this is happening after the judgment, after they've said they won't take $100,000. And the question is whether what USIA did in terms of trying to get that money paid to the SCOBIs was outrageous or amounted to reckless indifference. And whether or not we can disagree that perhaps USIA should have just put the money into the registry despite the lack of clarity on that point. Don't we apply the three-pronged Whitmer test? Yes. And I suggest that the third prong here is the one that... Well, let's talk of... I just want to ask you, the first prong is that the insurer must be obligated to pay the claim under the policy. By the time after the jury renders this verdict, that's beyond dispute, right? I think that's correct. And then the second is the insurer must lack a reasonable basis in law and fact for denying the claim. Do you agree? By that point, you can't deny the claim. By that point, the judgment debtor owes the debt. Now, I guess there would conceivably be some circumstances where the judgment debtor might take an appeal on the merits and the parties might seek a stay of execution on the judgment, at which point in time the payment would not be due. But here, the judgment debtor, the defendant ad litem, while she appealed to try to get the judgment reduced to the $100,000 amount, she did not take an appeal on the merits. So I suspect at that point in time, without a stay of execution of the judgment, USAA would be obligated to... So that leaves us with number three. The insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. And this is the point where I'm just not hearing much of a colorable argument in behalf of the insurance company after this jury verdict was entered. And these questions, I think, are really kind of going unanswered of why didn't the company simply tender up the $100,000, cut the check, send it, and walk away. The offer was made. The offer was unanswered. If the Scobies believed that the appropriate course was an immediate check to them, all they had to do was write back and say, No, pay this into the registry or pay us and we're not going to accept this. We're not going to deem it in satisfaction of the judgment. The Scobies did none of those things. You would have paid it at that point. Is that what you're saying? You would have paid it at that point if they had said that? I imagine if there was an agreement on the record from the Scobies that we could have paid that money into the registry at that point in time. No, you said write them a check. I just don't know. That's fair. The record does not make that clear, Judge Arnold. Ms. Rogers mentioned that there's case law about the role that a delay in payment plays in the bad faith analysis. The Sixth Circuit has noted that in the Shaheen case, that a delay isn't bad faith unless you're dealing with an insurance company that's trying to get a more favorable settlement than what the law allows or is trying to deceive the claimant into a settlement that's not the appropriate amount of coverage. Here you have the carrier saying to the Scobies, We will pay the full $100,000 limits on the policy. We just believe that this will satisfy the judgment. Ultimately, the courts say that the judgment was due to be reduced to that $100,000 amount. So USAA is right about those things, ultimately. It can't be in bad faith. It can't be deemed to be outrageous or recklessly indifferent to the extent that it's making these offers in this particular way. It's not even clear to me what the Scobies would say were there damages at that point. What's the time frame from the judgment in the underlying case to the initiation of the bad faith claim? I'm not sure, Judge Smith. I'm sorry. I can file a submittal brief if the court needs that information, but I think it's a fairly quick filing. Ms. Rogers may have that information at her fingertips. As I understand it, finally, the $100,000 plus some change was eventually paid in 2024? That's correct. After the district court made clear that the judgment was to be reduced to the $100,000 policy limits from the $7 million that was initially obtained by the Scobies and after the judgment could be paid into the registry of one of two courts, USAA immediately paid that money into the registry.  There are a vast number of other issues that Ms. Rogers addressed, and I'm happy to move to any particular question that the court has about those points. With respect to the principal claim that the plaintiffs have raised here of bad faith, failure to settle, I mentioned at the outset that the critical time period is the very limited window of time between September of 2015 and October 2015 when the Scobies were willing to settle at the $100,000 amount. Much of the evidence that Ms. Rogers cited to the court today deals not with things that were in front of USAA at that particular time in the fall of 2015, but rather with developments that occurred in 2017 during the litigation of this case, at which point in time the Scobies undisputedly were unwilling to settle for the $100,000 amount. During the critical window of time in the fall of 2015 here, Mr. Norris's liability was not beyond dispute. In fact, Mr. Norris's liability up until Judge Shepard, that jury verdict, was never beyond dispute in this case in light of the testimony that was presented at trial by the expert for Mr. Norris. Ms. Rogers mentioned that the expert for Mr. Norris testified about this apparent guardrail strike. He also testified about the Scobies' theory that this particular accident occurred because the left side of Mr. Norris's car struck Mr. Scobies' motorcycle. That expert testified that that particular theory, that the motorcycle could have impacted the left side of the car and Mr. Scobie nonetheless could have wrecked on the right side of the street, causing a pole to fall on the front of Mr. Norris's car, was contrary to the laws of physics. So we have an expert testifying at the trial years later that the Scobies' theory is contrary to the laws of physics, that the liability isn't even beyond dispute at that point in time. It certainly wasn't beyond dispute in the fall of 2015 when the Scobies were actually willing to settle at policy limits. This was not your classic car wreck case in which everybody agreed that the collision occurred and that the insured was at fault. It certainly wasn't a case where the insured said, look, I'm worried I'm at fault. I want to settle this case. Mr. Norris said he didn't hit this motorcycle. He was 50 yards away. If Mr. Norris had said something different, then this case would be different, but there's no dispute that those were the facts that were relayed to the USAA by Mr. Norris. Now, Ms. Rogers says that USAA couldn't rely on its insured statement standing alone, but the insured did not rely on those statements standing alone. It relied on this evidence to which Judge Arnold adverted in his questions to Ms. Rogers concerning the fact that the Scobies' theory would have required a strike on the left side of the car and nonetheless the motorcycle crashing on the right side of the street. It wasn't like there were eyewitnesses who testified that Mr. Norris had struck the car. Mrs. Scobie did not see this accident. That's undisputed. Even the testimony that Ms. Rogers mentioned of Mr. Scobie during his later deposition in the case was vastly different from the statements that were in the record from Mr. Scobie. In fact, the doctors, the hospitals memorialized that as to the details of the event, Mr. Scobie thought that somebody had hit him, but Mr. Scobie was amnestic in the words of the medical records. Also critical for the purposes of assessing whether anything USAA did during that time period could be said to be in bad faith was the back and forth in the letter of September 2015 and USAA's response in October 2015. The letter, I disagree strongly with Ms. Rogers' characterization that the September 2015 letter was comprehensive. Yes, the letter presented comprehensive medical records concerning Mr. Scobie's injuries, but the liability discussion was a single paragraph of that letter that said little more than that Mr. Norris had hit Mr. Scobie from behind. The letter presented no evidence or details concerning that allegation and the attached photos Ms. Rogers has mentioned simply did not establish anything like liability that was beyond dispute. Even so, and I think Judge Arnold asked a question along these lines, USAA didn't write back and say to Mr. Scobie, no, we will never pay. They instead wrote Mr. Scobie back and said, or Mr. Scobie's attorneys back and said, we don't see any liability on behalf of our insured, but, and I'm reading from the letter now, please provide any proof of liability as well as your theory of negligence against William Norris. We will gladly review any documentation submitted. I look forward to working with you to amicably resolve this matter. Rather than offering any evidence or a willingness to work with USAA in the matter, the Scobies stood silent. They did not respond at all and they cannot now turn around and say that USAA's failure to immediately accept policy limits in light of all the evidence that was in front of USAA at that time and the investigation that it had conducted amounted to bad faith. And I close by saying that the lack of response to that letter in October 2015 is much like the lack of response that USAA received to the letter tendering the $100,000 after the jury verdict in this case. It's utterly unclear in any event how the failure, how the subsequent events in terms of the declaratory judgment action proceeding and the like and ultimately the $100,000 being paid into the court registry could be deemed to have injured the Scobies in any meaningful way. I see that my time is up. Thank you very much. Thank you, Mr. Diamond. Ms. Rogers, your rebuttal.  Your Honors, we're right to question, why didn't you just pay after the judgment? There was a motion filed by the defendant ad litem for leave to deposit money into the court registry on November 22, 2021. And the court denied the motion but said, nothing in this order shall prohibit partial payment directly to plaintiffs, but such payment shall not operate a satisfaction of judgment. This is in the appendix at page 63. USAA filed a motion to deposit the funds, yet they never deposited the funds, even when the court told them they could. And we're here, he can disagree all he, Mr., I'm sorry, my colleague can disagree all he would like about how comprehensive this demand was, but the USAA 30B-6 deposition said it was comprehensive and had everything they needed. The fact that they responded in three weeks didn't even take the full time to say, we see no liability on the part of our insured. They based that on a handful of conversations with their insured. That's it. They turned a blind eye to the available information, which were the recorded statements where he said all of this damage happened at this accident. And he talks, he's actively asked about the side damage by the police officer who's clearly interested in this. And let's not forget the other part of this, where we have erratic driving, and we have moments before the accident. USAA's 30B-6 agreed, you can have liability without contact. But even despite all of this, at the time the demand was denied, or there was no offer made at the time the demand deadline ran, USAA became aware of very troubling facts about its insured and never made an offer. They can talk about, we floated it, we did all these things. They did not. There is no evidence of an offer. There is no evidence of authority to make the offer. And the 30B-6 establishes that. USAA never made an offer. Even after their insured's credibility was absolutely in the gutter. He used heroin the day of the accident. Had the officer done his job and drug tested him, he would have tested positive for heroin. And there is evidence that drugs did play a role here. We never got to investigate that, and the jury never heard that. More importantly, imagine what the verdict might have been had the jury been privy to that information. Thank goodness the district court saw fit to turn that over. It should have been turned over at the time. And the district court unfortunately failed to view the facts in the light most favorable to the Scobies when they granted USAA's motion here. There is a genuine issue. In order for you to dispute liability, there has to be a genuine dispute. If the facts are fairly debatable, the Kentucky court says you have to debate them fairly. That's the point. The genuine word is the operative word here. If it's a manufactured defense, after litigation commences, it's never mentioned in the claim file, it's only after attorneys and everything else gets involved, and the only person that corroborates it is your paid expert, all the physical evidence goes against you, it's not a genuine dispute. What would happen here today if USAA is successful is that all insurers will do is ask their insurer, did you do it? They say no. That's it. We can turn a blind eye to the available information, and we can deny claims. That's going to be the new playbook. So I posit to the court this is not a close call. The Scobies are due to reach a jury on this issue. Thank you, Your Honors. Thank you, Ms. Rogers. Thank you also, Mr. Nyman. The court appreciates both counsel's participation and argument before the court. It's been helpful. We'll continue to study the record and render a decision in due course. Thank you.